IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-163

No. 16PA20

Filed 17 December 2021

STATE OF NORTH CAROLINA, ex rel. JOSHUA H. STEIN, Attorney General

v.

KINSTON CHARTER ACADEMY, a North Carolina non-profit corporation; OZIE L. HALL, JR., individually and as Chief Executive Officer of Kinston Charter Academy; and DEMYRA MCDONALD HALL, individually and as Board Chair of Kinston Charter Academy

On discretionary review pursuant to N.C.G.S. § 7A-31(a) from a unanimous decision of the Court of Appeals, 268 N.C. App. 531 (2019), reversing, in part, and affirming, in part, orders entered by Judge A. Graham Shirley in the Superior Court, Wake County, on 23 March 2018 denying dismissal motions filed by defendants Kinston Charter Academy and Ozie L. Hall, Jr. Heard in the Supreme Court on 31 August 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Matthew L. Liles, Sr.; Senior Deputy Attorney General Kevin D. Anderson; and Special Deputy Attorney General Daniel P. Mosteller, for the State-appellant.*

*Ragsdale Liggett PLLC by Amie C. Sivon, Mary M. Webb, and Edward E. Coleman, III, and Demyra McDonald-Hall for defendant-appellant Kinston Charter Academy.*

*Ozie L. Hall, Jr., pro se defendant-appellant.*

*Stam Law Firm, PLLC, by R. Daniel Gibson and Paul Stam for amicus Pinnacle Classical Academy.*

*Womble, Bond Dickinson (US) LLP by Matthew F. Tilley for amicus N.C. Coalition for Charter Schools, amicus curiae.*

ERVIN, Justice.

¶ 1   The issues before us in this case involve the extent to which the non-profit corporations that operate charter schools are (1) agencies of the State entitled to sovereign immunity and (2) subject to claims brought pursuant to the North Carolina False Claims Act; whether (3) the State adequately pled claims under the False Claims Act against the non-profit corporation and a corporate officer; and (4) whether a corporate officer of such a non-profit corporation is entitled to public official immunity. After a careful review of the relevant legal authorities in light of the facts disclosed by the record, we conclude that North Carolina charter schools are not state agencies and are, for that reason, precluded from asserting a defense of sovereign immunity; that North Carolina charter schools are "persons" as defined in N.C.G.S. § 1-607 (2019); that the State properly pled claims against the Academy and Mr. Hall for purposes of the False Claims Act; and that the trial court did not err by denying Mr. Hall's request that the State's complaint be dismissed on the basis of public official immunity. As a result, the decision of the Court of Appeals in this case is affirmed, in part, and reversed, in part, with this case being remanded to the Court of Appeals for further remand to the Superior Court, Wake County, for further proceedings not inconsistent with this opinion.

## I. Factual and Procedural History

### A. Substantive Factual Background

The Academy is a nonprofit corporation organized and existing under North Carolina law that began operating a charter school in 2004.[1] The Academy served students from kindergarten through eighth grade and provided transportation for students residing in Lenoir, Pitt, and Greene counties. Mr. Hall served as Kinston Charter Academy's Chief Executive Officer. As Chief Executive Officer, Mr. Hall provided both financial and academic leadership for the Academy. Mr. Hall's wife, Demyra McDonald-Hall, began serving as the Chair of the Academy's Board of Directors in 2007.

The Academy experienced financial difficulties from the date upon which it began operation and would, in all probability, have closed in 2007 except for the fact that five of the eight members of the Board of Directors took out personal loans for the purpose of ensuring the Academy's continued operation. The Department of Public Instruction, which has the responsibility for overseeing North Carolina public

---

[1] In light of the fact that this case is before us on appeal from an interlocutory order addressing motions to dismiss for failure to state a claim for which relief can be granted pursuant to N.C.G.S. § 1A-1, Rule 12(b), we have presented the facts as stated in plaintiff's complaint, including the information contained in the exhibits attached to that complaint. *See Est. of Long v. Fowler*, 378 N.C. 138, 2021-NCSC-81, ¶ 5 (stating that this Court "accept[ed] the allegations in the complaint as true" given that the case was before this Court "on the trial court's order granting a motion to dismiss pursuant to [N.C.G.S. § 1A-1,] Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the North Carolina Rules of Civil Procedure") (citing *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 611 (2018).

schools, cited the Academy on at least six occasions between 2008 and 2013 for having deficit fund balances. For example, the Department placed the Academy on "Financial Probationary Status" on 5 June 2008 given the existence of a deficit fund balance that totaled over $300,000. Similarly, the Department placed the Academy on the highest level of "Financial Disciplinary Status" on 24 March 2010. In the final full year during which the Academy operated, Mr. Hall's daughter, who did not have a degree in education and who had never previously worked at a school, was hired as the Academy's "academic officer" at an annual salary of $40,000 in place of an associate principal who had more than twenty years' experience working in public education. On 5 June 2013, the Department placed the Academy on "Governance Cautionary Status" in light of the fact that the Academy, after withholding funds from its employees' paychecks, had failed to submit the amounts associated with premiums for those employees' health insurance plans to the State Treasurer.

¶ 4 In an effort to obtain sufficient funds to pay its outstanding obligations, the Academy obtained two short-term loans in the spring and early summer of 2013. On 31 May 2013, the Academy obtained a $100,000 short-term loan that included a $15,000 origination fee that was to be subtracted from the loan amount and a $15,000 broker's fee. On 21 June 2013, the Academy obtained a second $100,000 short-term loan that also included a $15,000 origination fee to be deducted from the loan amount and a separate $15,000 broker's fee. Having guaranteed repayment of both loans,

Mr. Hall was personally liable to the lenders in connection with each of these obligations.

¶ 5        On 21 January 2013, the Academy reported to the Department that it projected having an average daily membership of 310 students, with this figure representing an estimate of the number of students that the Academy would enroll during the following academic year that was used for the purpose of establishing the amount of funding that the Academy was entitled to receive from the State. On 26 April 2013, the Academy provided the Department with a revised average projected daily membership of 366 students. More specifically, Mr. Hall told a representative of the Department during a 26 April 2013 phone call that, even though he had "not physically been on the [Academy] campus much and that the person [that he had] left in charge was incompetent," the Academy's projected enrollment for the 2013–14 school year would increase to 366 students, with this revised estimate representing an increase of 92 students over the actual enrollment for the previous year (despite three years of declining enrollment) and being the maximum estimate of student attendance that the Academy was entitled to claim without seeking and obtaining prior approval from the State Board of Education. According to a later examination by the State Auditor, there was "no evidence supporting an estimated student attendance increase."

¶ 6          In July of 2013, the Academy received funds from the local school board, with these funds having been used to pay off loans that had been taken out in connection with the previous academic year and to pay off contributions to the State Health Plan that the Academy had failed to make during that same period of time. On 29 July 2013, Mr. Hall sent a letter to the Department stating that the Academy's employees had been informed that the payments associated with their health insurance premiums and retirement contributions had been delayed, that the Academy was attempting to refinance the indebtedness associated with its facilities in order to obtain the funds needed to continue to operate the Academy, and that, in the event that he was unable to complete the refinancing process, he would recommend that the Board of Directors close the Academy.

¶ 7          On 6 August 2013, the Academy received over $600,000 from the State for use during the 2013-14 school year. This amount had been calculated based upon an average daily membership of 366 students and was intended to last until October 2013, when the Academy would receive its next scheduled allotment. On the same day, the Academy paid Mr. Hall $5,000 for "unused vacation time." On 12 August 2013, the Academy paid $2,500 to Mr. Hall's daughter for a "website redesign" that was never implemented. On 16 August 2013, the Academy paid Ms. McDonald-Hall over $1,000 as an advance against her "unused annual leave." On the same day, the Department sent a letter to Mr. Hall for the purpose of informing the Academy that

the Department intended to recommend the revocation of the Academy's charter in light of its persistent failure to comply with applicable financial requirements and its failure to pay employee benefits. On 22 August 2013, the Academy made another payment of $1,500 to Mr. Hall for "unused annual leave." On 23 August 2013, Mr. Hall sent an e-mail to a Department official stating that he had recommended to the Board that the Academy "close the school and surrender the charter to the State Board of Education."

¶ 8    At the time that the Academy opened on 26 August 2013, it had enrolled only 189 students for the 2013–14 academic year, an amount that was 177 students less than the estimate that the Academy had submitted to the Department in the spring. In spite of Mr. Hall's 23 August 2013 e-mail, the Board discussed, over the course of the ensuing week, the implementation of a "corrective action plan" that involved a change in the Academy's management structure and was intended to keep the Academy open. On 4 September 2013, after the Department rejected requests made by Mr. Hall and Ms. McDonald-Hall for additional time within which the Academy would be allowed to implement a corrective action plan, the Academy relinquished its charter to the State. Two days later, on the ninth day of the academic year, the Academy closed.

¶ 9    On 10 September 2013, Department officials informed Mr. Hall and Ms. McDonald-Hall during a contentious meeting that the Academy would need to repay

the funds that had been allotted to the Academy based upon the over-estimate of its student enrollment numbers. Mr. Hall refused to grant the Department officials access to the Academy's records and later complained that the Department was attempting to conduct an "illegal search and seizure" of those records. On 12 September 2013, the Board held a meeting during which it approved the payments that had been made to Mr. Hall and Ms. McDonald-Hall relating to "unused annual leave" and the purchase of a new laptop computer to replace Mr. Hall's personal computer.

¶ 10        On 28 January 2015, the Office of the State Auditor released the findings that it had made as the result of an investigation into the Academy's failure. The Auditor found that the Academy had "overstated enrollment," that it had "employed defendants Hall and McDonald-Hall's unqualified relatives at a cost to the school [of] $92,500 in the final year," and that "defendants Hall and McDonald-Hall accepted over $11,000 in questionable payments despite owing more than $370,000 in payroll obligations" to the Academy's employees. The State did not recoup any funds from the Academy after it closed.

**B. Procedural History**

¶ 11        On 26 April 2016, the State filed a complaint against the Academy; Mr. Hall, both individually and as the Academy's Chief Executive Officer; and Ms. McDonald-Hall, both individually and as the Chair of the Academy's Board. In its complaint,

the State alleged that the defendants had "violated the North Carolina False Claims Act by making false or fraudulent statements" in order to receive money from the State, with these statements having included the Academy's projected enrollment of 366 students, "a number that defendants knew or should have known they would not achieve"; the Academy's "claim for state educational funds for the 2013–14 school year when defendants knew or should have known that [the Academy] would not survive the year"; and the Academy's "false claim for state funds to be used for a non-profit educational purpose that were instead used to benefit defendants." Secondly, the State alleged that defendants had violated various duties imposed upon them by the statutory provisions governing the operation of non-profit corporations by "[m]aking unreasonable distributions to directors and officers"; by "[f]ailing to discharge their duties to the corporation in good faith[,] with ordinary care[,] and [in] a manner in the best interest of the corporation"; by "[f]ailing to comply with the conflict of interest requirements"; and by "[f]ailing to comply with [the statute] in disposing of all or substantially all of [the Academy]'s assets." The State also alleged that Mr. Hall and Ms. McDonald-Hall had violated other relevant statutory provisions by failing to discharge their duties "in good faith," "with the care an ordinarily prudent person in a like position would exercise under similar circumstances," and "in a manner [that they] reasonably believe[d] to be in the best interests of the corporation." Finally, the State alleged that defendants had violated

the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1 (2019), by "convincing prospective students to enroll for the 2013-14 school year despite knowing that it was unlikely [that the Academy] would make it through the year" and by misleading and deceiving consumers.

¶ 12     On 26 May 2017, Mr. Hall filed a motion to dismiss the claims that the State had lodged against him in his individual capacity pursuant to N.C.G.S. § 1A-1, Rules 12(b)(1) and 12(b)(6). On 30 June 2017, Ms. McDonald-Hall made a filing in which she requested that all of the claims that had been lodged against her and against the Academy be dismissed. On 17 August 2017, the trial court entered an order denying Mr. Hall's motion for dismissal of the False Claims Act claim that had been brought against him in his individual capacity while granting his motion to dismiss the claims that the State had lodged against him pursuant to the statutes governing the operation of non-profit corporations and N.C.G.S. § 75-1.1 and allowing Ms. McDonald-Hall's motion to dismiss all of the claims that the State had asserted against her in her individual capacity.

¶ 13     On 13 February 2018, Mr. Hall filed another motion in which he sought to have the State's False Claims Act claim dismissed pursuant to N.C.G.S. § 1A-1, Rule 12(b)(1). On 9 March 2018, the "[c]orporate [d]efendants," a group that consisted of the Academy and Ms. McDonald-Hall and Mr. Hall, acting in their official capacities, filed a motion to dismiss the State's remaining claims pursuant to N.C.G.S. § 1A-1,

Rules 12(b)(1), 12(b)(3), and 12(b)(6). On 23 March 2018, the trial court entered an order denying Mr. Hall's motion to dismiss the False Claims Act claim that had been lodged against him in his individual capacity and a separate order denying the motion to dismiss the False Claims Act claim that had been lodged against the Academy while granting the motion to dismiss the claims that the State had asserted against the Academy pursuant to the statutory provisions governing the operation of non-profit corporations and N.C.G.S. § 75-1.1 and all of the claims that the State had asserted against Mr. Hall and Ms. McDonald-Hall in their official capacities. Mr. Hall and the Academy noted appeals to the Court of Appeals from the trial court's orders.

¶ 14     In seeking relief from the trial court's order before the Court of Appeals, the Academy argued that the trial court had erred by denying its motion to dismiss the False Claims Act claim that had been asserted against it given that the Academy was protected from liability under the False Claims Act by the doctrine of sovereign immunity. In addition, the Academy argued that the State had failed to plead its False Claims Act claim with the requisite "particularity" and that the "[a]lleged [f]alse [s]tatement," which involved the estimate of the number of students that the Academy would enroll for the 2013–14 academic year, was "an [a]uthorized [p]rojection for the [f]uture, [n]ot [p]ossible of [b]eing [f]alse at the [t]ime [i]t [w]as [m]ade." Similarly, Mr. Hall sought relief from the trial court's order before the Court

of Appeals on the grounds that an "enrollment goal of 366 students" was permitted by law and could not, for that reason, be a "false or fraudulent claim." In addition, Mr. Hall argued that the State's False Claims Act claim was barred by the separation of powers clause of the North Carolina Constitution and "the doctrine of governmental/public official immunity."

¶ 15     In a unanimous published opinion, the Court of Appeals reversed the trial court's order denying the Academy's motion to dismiss the State's False Claims Act claim on the grounds that the Academy was entitled to sovereign immunity and that it did not qualify as a "person" for purposes of the False Claims Act. *State v. Kinston Charter Acad.*, 268 N.C. App. 531, 536 (2019). In reaching this result, the Court of Appeals began by reasoning that, since N.C.G.S. § 115C-238.29E(a) (2013), which was subsequently recodified as N.C.G.S § 115C-218.15 (2019), provided that a "charter school that is approved by the State shall be a public school within the local school administrative unit in which it is located," all charter schools were public schools. *Kinston*, 268 N.C. App. at 537. In addition, the Court of Appeals held that "[c]harter schools, as public schools in the State of North Carolina, exercise the power of the State and are an extension of the State itself" and, "as an extension of the sovereign," "are entitled to exercise the State's sovereign immunity" and that the Academy's "presumption of immunity" from liability pursuant to the False Claims Act could "only be overcome by an affirmative showing that the General Assembly intended to

waive sovereign immunity for all public schools," a showing that the State had failed to make. *Id.* at 538–39.

¶ 16    The Court of Appeals went on to hold that, "assuming, *arguendo*, that charter schools [we]re not categorically entitled to claim sovereign immunity from the" False Claims Act, the Academy could not be the subject of a claim brought pursuant to the False Claims Act given that the Academy functioned as an "arm of the state" for purpose of federal Eleventh Amendment analysis and was not, for that reason, a "person" for purposes of the False Claims Act. *Id.* at 539–40. After acknowledging that the False Claims Act should be interpreted "so as to be consistent with the federal False Claims Act," citing N.C.G.S. § 1-616(c), the Court of Appeals stated that "federal courts employ the Eleventh Amendment arm-of-the-state analysis in determining whether an entity is a 'person' under the" federal False Claims Act, with the required analysis focusing upon:

> (1)    whether any judgment against the entity as defendant will be paid by the State or whether any recovery by the entity as plaintiff will inure to the benefit of the State;
>
> (2)    the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions;
>
> (3)    whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and

(4)     how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State.

*Kinston*, 268 N.C. App. at 540 (citing *United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 575, 580 (4th Cir. 2012)).

¶ 17      In addressing the first of these factors, the Court of Appeals noted that a charter school's board of directors is required to obtain liability insurance under N.C.G.S. § 115C-218.20. *Id.* at 541. The Court of Appeals went on to explain that, prior to 1997, N.C.G.S. § 115C-238.29F(c), which has been recodified as N.C.G.S. § 115C-218.20 (2019), did not mention the immunity of charter schools, but that language added by the 1997 amendment provides that "[a]ny sovereign immunity of the charter school . . . is waived to the extent of indemnification by insurance," with this amendment constituting an acknowledgment that charter schools did "enjoy the State's sovereign immunity" while "waiv[ing] charter school immunity to the extent of indemnification by insurance." *Kinston*, 268 N.C. App. at 542. As a result, the Court of Appeals held that civil liability under the False Claims Act did not "attach[ ] to charter schools themselves, beyond the extent of indemnification by insurance, absent waiver." *Id.*

¶ 18      As far as the second factor in the required analysis is concerned, the Court of Appeals recognized that a charter school has a high degree of autonomy from the State in matters relating to the manner in which the school is operated and issues

relating to budgets, management, and curriculum. On the other hand, however, the Court of Appeals acknowledged that the charter school's authority is "limited by regulatory and reporting requirements" imposed by the State, so that its "autonomy only extends as far as [it complies] with its Board-approved charter and oversight by [the Department of Public Instruction]." *Id.* at 543.

¶ 19 In addressing the third factor, the Court of Appeals determined that the North Carolina Constitution "makes the State solely responsible for ensuring 'the right of every child in North Carolina to receive a sound basic education.'" *Id.* at 544 (quoting *Silver v. Halifax Cnty. Bd. of Comm'rs*, 371 N.C. 855, 856 (2018)). After reiterating its earlier determination that charter schools were public schools pursuant to N.C.G.S. § 115C-238.29E(a) (2013), subsequently recodified as N.C.G.S § 115C-218.15 (2019), and that public schools "directly exercise the power of the State," *Kinston*, 268 N.C. App. at 544 (quoting *Bridges v. City of Charlotte*, 221 N.C. 472, 478 (1942)), and after "considering and balancing all of the applicable factors of the arm-of-the-state inquiry," the Court of Appeals concluded that "charter schools [we]re not 'persons' for purposes of the" False Claims Act and that the trial court had erred by denying the Academy's motion to dismiss the False Claims Act claim that the State had asserted against it. *Id.*

¶ 20 Next, the Court of Appeals rejected Mr. Hall's contention that the trial court had erred by refusing to dismiss the False Claims Act claim that had been lodged

against him in his individual capacity on the grounds that he was entitled to public official immunity. *Id.* at 545. After noting that a public official "may be entitled to assert immunity even as to claims against [him] in his individual capacity," the Court of Appeals acknowledged that such immunity was "not limitless" and that a public official could be held liable for actions that were "corrupt, malicious, or outside the scope of his duties." *Id.* (citing *Smith v. Hefner*, 235 N.C. 1, 7 (1952)). As a result, the Court of Appeals held that, "at this early stage of the proceedings, viewing the material allegations of the State's complaint as admitted for purposes of [Mr.] Hall's motion to dismiss, [Mr.] Hall has not yet raised sufficient evidence of his entitlement to public official immunity to defeat the State's claim" and affirmed the trial court's denial of Mr. Hall's motion to dismiss the False Claims Act claim that the State had asserted against him. *Id.* at 546. This Court granted petitions for discretionary review filed by the State and conditional petitions for discretionary review filed by the Academy and Mr. Hall, all of which sought review of different aspects of the Court of Appeals' decision.

## II.    Analysis

### A. Standard of Review

¶ 21       "North Carolina has a well-established common law doctrine of sovereign immunity which prevents a claim for relief against the State except where the State has consented or waived its immunity." *Harwood v. Johnson*, 326 N.C. 231, 238

(1990) (quoting *Electric Co. v. Turner*, 275 N.C. 493 (1969)). Sovereign immunity applies to "state agenc[ies] created for the performance of essentially governmental functions" which are generally shielded from civil liability in the absence of a statutorily-based waiver. *Id.*

¶ 22 The doctrine of governmental immunity, which resembles that of sovereign immunity, renders local governments such as counties and municipal corporations "immune from suit for the negligence of [their] employees in the exercise of governmental functions absent waiver of immunity." *Meyer v. Walls*, 347 N.C. 97, 104 (1997) (quoting *State ex rel. Hayes v. Billings*, 240 N.C. 78, 80 (1954)). Although "[t]he State's sovereign immunity applies to both its governmental and proprietary functions," the "more limited governmental immunity covers only the acts of a municipality or a municipal corporation committed pursuant to its governmental functions." *Evans v. Hous. Auth. of City of Raleigh*, 359 N.C. 50, 53 (2004) (quoting *Guthrie v. N.C. State Ports Auth.*, 307 N.C. 522, 533 (1983)). In other words, while governmental immunity protects units of local government from suit for "acts committed in [their] governmental capacity," if the entity in question "undertakes functions beyond its governmental and police powers and engages in business in order to render a public service for the benefit of the community for a profit, it becomes subject to liability for contract and in tort as in case of private corporations." *Id.* (quoting *Town of Grimesland v. City of Washington*, 234 N.C. 117, 123 (1951))

(cleaned up). As a result, while a unit of local government may be entitled to governmental immunity "in tort and contract for acts undertaken by its agents and employees in the exercise of its governmental functions," such entities do not enjoy the full protections of sovereign immunity which the State and its agencies enjoy. *Id.* A state agency may assert sovereign immunity, or a municipal corporation may assert governmental immunity, as a complete defense to a civil lawsuit at the pleading stage. *See Guthrie v. N.C. State Ports Auth.*, 307 N.C. 522, 527 (1983).

As a general proposition, interlocutory orders are not immediately appealable unless the order in question affects a substantial right. N.C.G.S. § 7A-27(b)(3)(a) (2019). Although an order denying a dismissal motion predicated upon the doctrine of sovereign immunity is interlocutory in nature, such an order is immediately appealable "because it represents a substantial right." *Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 338 (2009). This Court reviews a trial court's decision to grant or deny a motion to dismiss based upon the doctrine of sovereign immunity using a de novo standard of review. *See White v. Trew*, 366 N.C. 360, 362–63 (2013) (reviewing an appeal from a trial court order denying "a motion to dismiss that raises sovereign immunity as grounds for dismissal" utilizing a de novo standard of review).

Similarly, this Court reviews issues involving the construction of statutes using a de novo standard of review. *Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 547 (2018) (quoting *In re Ernst & Young, LLP*, 363 N.C. 612, 616 (2009)). "It is

well settled that where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning." *In re Est. of Lunsford*, 359 N.C. 382, 391–92 (2005) (quoting *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209 (1990)) (cleaned up).

¶ 25 Finally, in determining whether a trial court correctly decided whether to dismiss a complaint for failure to state a claim for relief pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6), this Court examines "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Bridges v. Parrish*, 366 N.C. 539, 541 (2013) (quoting *Coley v. State*, 360 N.C. 493, 494–95 (2006)). In conducting the required analysis, "the allegations of the complaint must be viewed as admitted, and on that basis the court must determine as a matter of law whether the allegations state a claim for which relief may be granted." *Davis v. Hulsing Enterprises, LLC*, 370 N.C. 455, 457 (2018) (quoting *Stanback v. Stanback*, 297 N.C. 181, 185 (1979)). N.C.G.S. § 1A-1, "Rule 12(b)(6), generally precludes dismissal except in those instances where the face of the complaint discloses some insurmountable bar to recovery." *Newberne v. Dep't of Crime Control & Pub. Safety*, 359 N.C. 782, 784 (2005) (quoting *Energy Investors Fund, L.P. v. Metric Constructors, Inc.*, 351 N.C. 331, 337 (2000)) (cleaned up).[2] We

---

[2] Although a number of the motions that underlie the issues that are before us in this case were lodged pursuant to N.C.G.S. § 1A-1, Rule 12(b)(1) in addition to N.C.G.S. § 1A-1, Rule 12(b)(6), the standard of review for such motions is the same as the standard for motions

will now evaluate the issues that have been presented for our consideration using the applicable standards of review.

## B. Liability of Kinston Charter Academy

### *1. Sovereign Immunity*

¶ 26     In seeking to persuade us to reverse the Court of Appeals' decision in this case, the State begins by contending that the Court of Appeals erred by deciding that charter schools were entitled to the protections afforded by the doctrine of sovereign immunity. In the State's view, the Charter School Act, which is contained in Chapter 115C of the North Carolina General Statutes, demonstrates that charter schools are private, rather than public, institutions. In addition, the State cites our decision in *Turner v. Gastonia City Board of Education*, 250 N.C. 456, 463 (1959), for the proposition that local school boards in North Carolina are not considered "departments, institutions, [or] agencies of the State" and that local school boards operate with a significant degree of autonomy. Furthermore, the State argues that *Turner* distinguishes between the State Board of Education, which is an agency of the State, and local school boards, which serve "purely local functions." *Id.* According to the State, since charter schools enjoy an even greater level of autonomy from State control than is the case with local school boards and are "purely local" in character,

lodged pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6), given that the only factual materials presented for the trial court's consideration were those contained in the complaint. *Estate of Long*, 2021-NCSC-81, ¶ 15.

charter schools are not entitled to the protections of the doctrine of sovereign immunity.

¶ 27 The State also contends that any judgment entered against the Academy in this case would not be collectable from the State given that the State is not liable for any acts or omissions of a charter school, N.C.G.S. § 115C-218.20(b); that the debt incurred by a charter school does not "constitute an indebtedness of the State or its political subdivisions," N.C.G.S. § 115C-218.105; and that the State seeks to recoup money that it had previously allocated to the Academy in this litigation. In the State's view, the fact that a judgment against a charter school would not be collectable from the State treasury weighs heavily against a finding that a charter school like the Academy is entitled to sovereign immunity. *See Smith v. State*, 289 N.C. 303, 321 (1976) (holding that the State of North Carolina was not entitled to assert sovereign immunity as a defense in a contract action given that the State typically "keep[s] its part of the bargain" after entering into a valid contract and that the Court's holding would not "have a significant impact upon the State treasury or substantially affect official conduct").

¶ 28 Similarly, the State contends that relevant provisions of the Charter School Act demonstrate that the General Assembly did not intend for charter schools to be categorized as state agencies, with this contention resting upon the statutory requirement that charter schools "operate independently of existing schools" and that

charter schools be "operated by [ ] private nonprofit corporation[s]." N.C.G.S. §§ 115C-218(a), 115C-218.15(b). In addition, the State points to the contrast between the language contained in the Charter School Act and that contained in the legislation creating the State Ports Authority, which this Court has determined to be a state agency entitled to assert the defense of sovereign immunity, *see Guthrie*, 307 N.C. at 528 (1983), with the latter having provided that the State Ports Authority was "created as an instrumentality of the State of North Carolina," that the Authority was a "division of the Department of Commerce," and that the Authority provided a means by which "the State of North Carolina may engage in promoting, developing, constructing, equipping, maintaining and operating the harbors and seaports within the State," *id.* at 527–28 (citing N.C.G.S. §§ 143B–453, 431(2)(*l*) (1981)), while the former contained no such language.

¶ 29      Finally, the State contends that the Academy is not entitled to rely upon a defense of sovereign immunity in response to an action brought by the State given that the immunity of a lesser sovereign, such as a county, local school board, or charter school, must yield to the greater sovereignty of the State. *See State Highway Comm'n. v. Greensboro City Bd. of Educ.*, 265 N.C. 35, 39–40 (1965) (holding that the State Highway Commission, which was a "State agency or instrumentality," was entitled to use the State's power of eminent domain to take property belonging to a local school board); *see also N.C. DOT v. Cnty. of Durham*, 181 N.C. App. 346, 349

(2007) (reasoning that, "[b]ecause the counties derive their sovereign immunity and all other powers and authority from the State" "the counties' sovereign immunity cannot be superior to that of the State"). As a result, for all of these reasons, the State urges us to reverse the Court of Appeals' determination that the Academy was entitled to rely upon a defense of sovereign immunity in response to the claim that the State had asserted against it pursuant to the False Claims Act.

¶ 30      In seeking to persuade us to affirm the Court of Appeals' decision with respect to the sovereign immunity issue, the Academy claims that it is a part of the North Carolina school system rather than a unit of local government. In addition, the Academy emphasizes the provisions of the Charter School Act which "show[ ] that [charter schools] are public schools" and which "discuss how a charter school may waive sovereign immunity"; the fact that the North Carolina Constitution "requires [that] the State provide education and [that] charter schools help fulfill this mandate"; and the fact that "charter schools function as part of the State" and are managed as such. The Academy argues that the existence of N.C.G.S. § 115C-218.20 (formerly section 115C-238.29F(c)), which provides that "[a]ny sovereign immunity of the charter school . . . is waived to the extent of indemnification by insurance," demonstrates the General Assembly's recognition that charter schools "are an extension of the sovereign and have sovereign immunity except to the extent it is waived" by statute. The Academy further notes that appellate courts in Texas and

Georgia have recently found that charter schools are entitled to sovereign immunity under their respective state laws, *see El Paso Educ. Initiative, Inc. v. Amex Properties, LLC*, 602 S.W.3d 521, 530 (Tex. 2020); *see also Campbell v. Cirrus Educ., Inc.*, 355 Ga. App. 637, 641 (2020), and contends that the General Assembly has not provided for a waiver of sovereign immunity with respect to claims asserted under the False Claims Act, so that such a claim cannot be maintained against a charter school. *See Orange Cty. v. Heath*, 282 N.C. 292, 296 (1972) (holding that sovereign immunity cannot be "abrogated, abridged, or surrendered, except in deference to plain, positive legislative declarations to that effect").

The Academy argues that the relevant authorities provide no support for the State's claim that "lesser sovereigns" are not entitled to assert a defense of sovereign immunity in opposition to claims advanced by the State given that both the State and its agencies enjoy "absolute and unqualified" sovereign immunity, citing *Guthrie*, 307 N.C. at 534–35. As additional support for this contention, the Academy directs our attention to *N.C. Insurance Guaranty Ass'n v. Board of Trustees of Guilford Technical Community College*, 364 N.C. 102, 112 (2010), in which this Court held that the General Assembly had clearly waived sovereign immunity by making the Workers' Compensation Act applicable to claims brought by governmental employees. According to the Academy, the Court in *N. Carolina Ins. Guar. Ass'n* "necessarily

found that sovereign immunity was otherwise available as a defense that could be waived" by the community college.

¶ 32        In assessing whether charter schools are state agencies entitled to assert a defense of sovereign immunity, we begin by examining the relevant provisions of the Charter School Act. In authorizing the creation of such schools, the General Assembly stated that they were intended to "provide opportunities for teachers, parents, pupils, and community members to establish and maintain schools that operate independently of existing schools." N.C.G.S. § 115C-218(a). In addition, the General Assembly provided that,

> (a)        A charter school that is approved by the State shall be a public school within the local school administrative unit in which it is located. All charter schools shall be accountable to the State Board for ensuring compliance with applicable laws and the provisions of their charters.
>
> (b)        A charter school shall be operated by a private nonprofit corporation that shall have received federal tax-exempt status no later than 24 months following final approval of the application. The board of directors of the charter schools shall adopt a conflict of interest and anti-nepotism policy that includes, at a minimum, the following:
>
> > (1)        The requirements of Chapter 55A of the General Statutes related to conflicts of interest.
>
> . . .
>
> (d)        The board of directors of the charter school shall decide matters related to the operation of the school, including budgeting, curriculum, and operating procedures.

N.C.G.S. § 115C-218.15. The General Assembly has prohibited charter schools from charging tuition, N.C.G.S. § 115C-218.50, and has provided that they be primarily funded by the State and local school boards, which allocate funds to charter schools on a per-pupil basis. More specifically, for each child attending a charter school, the State must distribute "[a]n amount equal to the average per pupil allocation for average daily membership from the local school administrative unit allotments in which the charter school is located," while the relevant local school board must distribute "an amount equal to the per pupil share of the local current expense fund of the local school administrative unit" to the charter school. N.C.G.S. § 115C-218.105. In the event that a charter school increases its enrollment by twenty percent or less from one academic year to the next, that increase is not considered a "material revision" subject to approval by the State Board of Education. N.C.G.S. § 115C-218.7. If the school's enrollment increases by a figure that is greater than twenty percent, the charter school must obtain a charter amendment authorizing such an increase from the State Board of Education. *Id.*

¶ 33     As this Court has previously stated, the General Assembly's decision to explicitly categorize an entity as an agency of the State "carries great weight." *Guthrie*, 307 N.C. at 528. The General Assembly has not, for whatever reason, chosen to categorize charter schools as state agencies or instrumentalities and has, instead, classified charter schools as entities that "operate independently of existing schools"

that are run by "private non-profit corporations." As a result, given that statutory language must be construed in accordance with its clear and unambiguous meaning, we hold that the General Assembly did not intend for charter schools to be deemed to be agencies or instrumentalities of the State.

¶ 34        Although the Academy and the Court of Appeals place considerable reliance upon the 1997 amendment to the Charter School Act addressing the extent to which charter schools may be held to be civilly liable in the course of concluding that charter schools are entitled to assert a defense of sovereign immunity, we do not find that argument persuasive. According to the relevant statutory language:

> (a)    The board of directors of a charter school may sue and be sued. The State Board of Education shall adopt rules to establish reasonable amounts and types of liability insurance that the board of directors shall be required by the charter to obtain. The board of directors shall obtain at least the amount of and types of insurance required by these rules to be included in the charter. Any sovereign immunity of the charter school, of the organization that operates the charter school, or its members, officers, or directors, or of the employees of the charter school or the organization that operates the charter school, is waived to the extent of indemnification by insurance.
>
> (b)    No civil liability shall attach to the State Board of Education, the Superintendent of Public Instruction, or to any of their members or employees, individually or collectively, for any acts or omissions of the charter school.

N.C.G.S. § 115C-218.20 (2019). Although the Academy and the Court of Appeals contend that the statutory references to "[a]ny sovereign immunity of the charter

school" effectively grants sovereign immunity to such institutions, we are unable to read the relevant statutory language in that fashion. Instead, when read literally, N.C.G.S. § 115C-218.20(a) simply states that, to the extent that sovereign immunity is otherwise available to charter schools, any such immunity is waived to the extent that the school purchases liability insurance. For that reason, the extent to which the school is, in fact, entitled to rely upon a defense of sovereign immunity must be determined on the basis of an analysis of other legal authorities rather than on the basis of the provisions of N.C.G.S. § 155C-218.20(a). Our construction of N.C.G.S. § 115C-218.20(a) to this effect is bolstered by the language of N.C.G.S. § 115C-218.20(b), which is obviously intended to ensure that the Superintendent of Public Instruction, the State Board of Education, and their agents cannot be held liable for the acts or omissions of a charter school, with such a provision being unnecessary in the event that charter schools were afforded the benefits of sovereign immunity.

¶ 35 In addition, we agree with the State's contention that charter schools are local rather than statewide in character and that such locally oriented entities are typically protected by governmental, rather than sovereign, immunity. In *Turner v. Gastonia City Board of Education*, 250 N.C. 456, this Court examined the viability of a claim asserted by the plaintiff stemming from an injury that allegedly resulted from the negligent operation of a lawnmower by an employee of the Gastonia City Board of Education, with the question before the Court in that case being whether the plaintiff

was entitled to recover compensatory damages from the local board of education, the

State Board of Education, or both, and whether any such claim had to be heard before

the Industrial Commission, which has exclusive jurisdiction over claims brought

against the State pursuant to the State Tort Claims Act. *Id*. At 460. In distinguishing

between a local school board and the State Board of Education, this Court held that

the State Board of Education, but not local school boards, could be held liable under

the State Tort Claims Act on the theory that

> [t]he General Assembly created the State Board of
> Education and fixed its duties. It is an agency of the State
> with statewide application. The General Assembly
> likewise created the county and city boards and fixed their
> duties which are altogether local. The Tort Claims Act,
> applicable to the State Board of Education and to the State
> departments and agencies, does not include local units
> such as county and city boards of education.

*Id*. at 462–63. At that point, the Court addressed the issue of whether an employee

of a local school board was an employee of the State, so that the State could be held

liable for negligent conduct on the part of such an employee under the State Tort

Claims Act. *Id*. at 463. In answering this question in the negative, this Court stated

that:

> [i]n no sense may we consider the Gastonia City Board of
> Education in the same category as the State Board of
> Education . . . . The Gastonia City Board of Education does
> not meet the classification. County and city boards of
> education serve very important, though purely local
> functions. The State contributes to the school fund, but the

> local boards select and hire the teachers, other employees
> and operating personnel.  The local boards run the schools.

*Id.*  As a result, in determining that local school boards had a "purely local" character and were not agencies or instrumentalities of the State, this Court held that the plaintiff was not entitled to maintain a claim against either defendant given that local school boards were protected by the doctrine of governmental immunity and an employee of a local school board was not an employee of the State.

¶ 36    This Court's conclusion in *Turner* that local school boards were not state agencies or instrumentalities was echoed by the decision of the United States Court of Appeals for the Fourth Circuit in *Cash v. Granville County Board of Education*, 242 F.3d 219, 221 (4th Cir. 2001).  In *Cash*, the Fourth Circuit held that, since the Granville County Board of Education was "more like a county than an arm of the State," *id.* at 221, it was not entitled to rely upon the doctrine of sovereign immunity, reasoning that, even though state agencies and state instrumentalities are protected by the State's sovereign immunity for Eleventh Amendment purposes, any such immunity "does not extend to counties and similar municipal corporations . . . even if the counties and municipalities exercise a slice of State power," i*d.* at 222 (cleaned up).  As a result, both this Court and the Fourth Circuit have recognized that local school boards are not entitled to claim sovereign, as compared to governmental, immunity.

¶ 37    As we understand the applicable statutory provisions, the board of directors of a charter school serves much the same function as a local school board, in that both entities are responsible for the immediate supervision of the schools subject to their control.    Admittedly, while local school boards control the school system in a particular geographic area, charter schools are not subject to any such specific statutorily grounded geographic constraint.  On the other hand, most charter schools are subject to a de facto geographic limitation in that, as a practical matter, they can only serve students that are able to travel to and from the school on a daily basis.[3] The State, on the other hand, has responsibility for establishing the overall policies, rules, and regulations applicable to both local school boards and charter school boards of directors.  In other words, both local school boards and charter school boards of directors have much more hands-on responsibility for the operation of specific educational institutions than either the Department of Public Instruction or the State Board of Education.  Thus, given the similarities between the functions performed by a local school board and the board of directors of a charter school and given that a local school board is entitled to governmental, rather than sovereign, immunity, we conclude that the analogy between these two types of school governmental entities suggests that charter schools are entitled to, at most, assert a defense of

---

[3] For example, the Academy only served students from Lenoir, Pitt, and Greene counties.

governmental, rather than sovereign, immunity.[4] As a result, for all of these reasons, we conclude that the Court of Appeals erred by holding that charter schools are entitled to assert a defense of sovereign immunity in opposition to the False Claims Act claim that the State brought against the Academy.

### 2. Whether the Academy is a "person" under the False Claims Act

¶ 38    In seeking to persuade us that the Court of Appeals erred by holding that the Academy was not a "person" for purposes of the False Claims Act, the State begins by noting that, while the False Claims Act does not contain a specific definition of a "person," a generally applicable statute provides that "[t]he word 'person' shall extend and be applied to bodies politic and corporate, as well as to individuals, unless the context clearly shows to the contrary." N.C.G.S. § 12-3(6) (2019). In the State's view, the definition of a "person" contained in N.C.G.S. § 12-3(6) is sufficiently broad to encompass corporate entities such as nonprofit corporations even if those entities perform public functions, as long as the entity in question is not entitled to rely upon

---

[4] The Academy did not clearly argue before either this Court or the Court of Appeals that it was immune from suit in this case on the basis of the doctrine of governmental immunity. Instead, both the Academy and the Court of Appeals focused their attention upon the issue of whether the Academy was entitled to assert a defense of sovereign immunity. Assuming, without in any way deciding, that the Academy would be entitled to rely on a defense of governmental immunity and that it had properly asserted such a defense in this case, any such contention would lack merit given that the governmental immunity available to local governmental entities must necessarily yield to the greater sovereignty of the State. *See Cnty. of Durham*, 181 N.C. App. at 349 (reasoning that, "[b]ecause the counties derive their sovereign immunity and all other powers and authority from the State . . . the counties' sovereign immunity cannot be superior to that of the State").

a defense of sovereign immunity. In support of this assertion, the State directs our attention to *Jackson v. Housing Authority of High Point*, 316 N.C. 259, 264 (1986), in which we presumed that the General Assembly was aware of the manner in which a "person" was defined in N.C.G.S. § 12-3 at the time that it enacted N.C.G.S. § 28A-18-2, which creates a statutory cause of action for wrongful death, so that governmental entities such as municipal corporations constituted "persons" and were, for that reason, subject to liability for wrongful death.

¶ 39    In addition, the State contends that, when the False Claims Act is read consistently with the federal False Claims Act as required by N.C.G.S. § 1-616(c), local governments and, by extension charter schools, are subject to liability under the Act. *See Cook Cnty v. United States ex rel. Chandler*, 538 U.S. 119, 122 (2003) (holding that municipal corporations qualify as "persons" for purposes of 31 U.S.C. § 3729, the federal False Claims Act). In addition, the State cites *United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 575, 579–80 (4th Cir. 2012), in which the Fourth Circuit held that the determination of whether an entity is considered a "person" under the federal False Claims Act hinges upon the extent to which the entity in question is "truly subject to sufficient state control to render [that entity] a part of the state," with the federal courts being required to utilize Eleventh Amendment "arm-of-the-state" analysis in order to make that determination.

¶ 40        The State contends that, in this case, there is no need for the use of "arm-of-the-state" analysis given that the use of such a method is not necessary to "determine the scope of sovereign immunity in state court," with this issue being, "instead[,] controlled by state law." In the alternative, however, the State contends that, even if "arm-of-the-state" analysis should be used in instances like this one, the Academy would still be a "person" capable of being sued under the False Claims Act given that the State is not liable for civil judgments entered against charter schools, charter schools operate with significant autonomy from the State, the operation of a charter school implicates purely local concerns, and the relevant statutory provisions establish that charter schools are not agencies or instrumentalities of state government.

¶ 41        In seeking to have us affirm the Court of Appeals' determination that charter schools are not "persons" subject to liability pursuant to the False Claims Act, the Academy begins by suggesting that, as a state agency, it is protected by the doctrine of sovereign immunity. In addition, the Academy asserts that a charter school is not a "person" for purposes of the False Claims Act in light of the failure of the False Claims Act to define "person" and the fact that the False Claims Act gives no indication that it was intended to authorize the filing of actions against state agencies, public schools, or charter schools. In the same vein, the Academy contends that treating charter schools as "persons" for purposes of the False Claims Act would

conflict with the Act's "spirit, intent, or purpose" given that the availability of qui tam actions, in which between fifteen and twenty-five percent of the resulting recovery would be paid to a private citizen who initiated such an action, would have the effect of "taking funds designated for educational purposes and giving them to a private citizen." According to the Academy, the Court of Appeals correctly utilized "arm-of-the-state" analysis in determining that charter schools were not subject to liability under the False Claims Act given that the False Claims Act is supposed to be construed consistently with the equivalent federal statutory provisions.

¶ 42          We begin our analysis of this issue by noting that the rules for statutory construction delineated in N.C.G.S. § 12-3 "shall be observed" "[i]n the construction of all statutes" "unless such construction would be inconsistent with the manifest intent of the General Assembly or repugnant to the context of the same statute." In view of the fact that a non-profit corporation of the type that is statutorily required to operate a charter school is clearly a "corporate" body, a charter school is necessarily encompassed within the statutory definition of "person" set out in N.C.G.S. § 12-3(6). As a result, as was the case in *Jackson*, the literal language of N.C.G.S. § 12-3(6) indicates that a charter school is a "person" subject to liability for purposes of the False Claims Act unless that result would be "inconsistent with the manifest intent of the General Assembly" or "repugnant to the context of the same statute."

¶ 43          We see no reason why utilizing a definition of "person" consistent with that set out in N.C.G.S. § 12-3(6) would be inconsistent with the General Assembly's intent in enacting the False Claims Act or repugnant to the remaining provisions contained in that legislation. The obvious purpose of the False Claims Act is to ensure that public funds are spent in the manner for which they were intended instead of being misappropriated, misspent, or misused. In view of the fact that a nonprofit corporation is perfectly capable of using public funds in a manner that is inconsistent with the prohibitions set out in N.C.G.S. § 1-607(a), the use of a definition of "person" that sweeps in such entities would not be in any way inconsistent with the purposes that the General Assembly sought to achieve by enacting the False Claims Act. Thus, the use of a definition of a "person" that includes a charter school for purposes of the False Claims Act seems perfectly consistent with the legislative intent as expressed in N.C.G.S. § 12-3(6).

¶ 44          In addition, none of the arguments that have been advanced by the Academy in opposition to the use of the definition of a "person" set out in N.C.G.S. § 12-3(b) have merit. As we have already demonstrated, a charter school is not entitled to invoke the doctrine of sovereign immunity as a defense to an action brought pursuant to the False Claims Act. In the same vein, given that "arm-of-the-state" analysis is used for purposes of the federal False Claims Act to ensure compliance with the protections available to state governments under the Eleventh Amendment and since

the same purpose is served by determining whether the entity against whom the action is sought to be brought is protected by the doctrine of sovereign immunity as a matter of state law, the use of "arm-of-the state" analysis for purposes of determining whether a particular entity is a "person" for False Claims Act purposes would be an exercise in redundancy. Similarly, the fact that the False Claims Act does not contain a definition of a "person" is entitled to little weight in our analysis given that such a definition, which is applicable to all statutory provisions, appears in N.C.G.S. § 12-3(6). Finally, the qui tam provisions of the False Claims Act do not render the use of a definition of a "person" consistent with N.C.G.S. § 12-6(3) inappropriate on the theory that these provisions would divert some amount of what would otherwise be public money to private citizens, given that the use of qui tam actions is an essential portion of the mechanism that has been created for the purpose of ensuring compliance with the strictures of the False Claims Act and that the same argument would justify absolving any and all public entities from False Claims Act liability, a result that would risk significant misuse of public funds. As a result, for all of these reasons, we hold that the Court of Appeals erred by holding that the Academy was not a "person" for purposes of the False Claims Act.

### 3. Pleading Requirements under the False Claims Act

¶ 45    In its conditional petition for discretionary review, the Academy sought and obtained authorization to address an additional issue that the Court of Appeals did

not reach relating to the sufficiency of the State's complaint in stating a claim under the False Claims Act. According to the Academy, the State's complaint did not satisfy the requirements for pleading a False Claims Act claim given the State's failure to plead its claim with sufficient particularity or to plead the existence of an objective falsehood.

¶ 46 According to the Academy, the average daily membership estimate of 366 students that it reported for the 2013–14 school year was nothing more than a "projection" that the Academy was statutorily authorized to make rather than an objective falsehood. In support of this assertion, the Academy directs our attention to the decision by the United States Court of Appeals for the Fifth Circuit that "[a] prediction, or statement about the future, is essentially an expression of opinion" that cannot be deemed to be objectively false. *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 680 (5th Cir. 1986). According to the Academy, "the alleged statement was legally authorized by statute and cannot be a false statement" given that the number of students specified in the allegedly false estimate "was within the twenty percent increase authorized" by N.C.G.S. § 115C-218.7. In the Academy's view, an estimate of increased enrollment that is within twenty percent of an existing estimate simply cannot be "unreasonable and reckless" or false and that the estimate was within the statutory scope of the discretion that the charter school was statutorily authorized to exercise.

¶ 47        Finally, the Academy argues that the fact that defendants made efforts to increase student enrollment at the Academy and to keep the school viable suffices to "defeat" the State's "allegations that the claim made for 366 students was knowingly false at the time it was made" in light of the board's hope that the school would remain open.  More specifically, the Academy claims that it "engage[d] in an advertising campaign, repair[ed] the HVAC, [bought] buses, and [sought] refinancing" in an attempt to remain open.  In addition, the Academy argues that the State was fully aware of the Academy's financial situation at the time that the allegedly false estimate was made and contends that, "[i]f the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim."  *United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 491 F.3d 254, 263 (5th Cir. 2007).

¶ 48        In response to the Academy's contentions, the State asserts that it satisfied the requirements for pleading a fraud-based claim set out in N.C.G.S. § 1A-1, Rule 9(b), by alleging the "time, place and contents" of the allegedly fraudulent claim.  According to the State, it satisfied the applicable pleading requirements by stating that, in a phone call that Mr. Hall made to the Department on 26 April 2013, he falsely "increased the school's projected enrollment for the next year to 366 students"; by naming the "person making the representation" as Mr. Hall; and by describing "what

was obtained as a result of the fraudulent acts or representations" as the "$344,340.44 in excess funds" that the State paid to the Academy as a result of the overstatement in the Academy's estimated enrollment. As a result, the State contends that its complaint adequately alleged a claim against the Academy pursuant to the False Claims Act.

¶ 49 According to the False Claims Act, any "person" who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval" or who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" shall be "liable to the State for three times the amount of damages that the State sustains because of the act of that person." N.C.G.S. §§ 1-607(a)(1), (2). N.C.G.S. § 1A-1, Rule 9(b) provides that, "[i]n all averments of fraud, duress or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In order to satisfy the particularity requirement delineated in N.C.G.S. § 1A-1, Rule 9(b), the plaintiff must allege the specific "time, place and content of the fraudulent representation, the identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Terry v. Terry*, 302 N.C. 77, 85 (1981).

¶ 50 In its complaint, the State alleged that, during a conversation with a Department official that occurred on 26 April 2013, Mr. Hall had "increased the school's projected enrollment for the next year to 366 students," with this number

representing "an increase of 56 students from the 310 estimated enrollment that [the Academy] submitted with a draft budget three months earlier" and that the making of this statement resulted in a violation of the False Claims Act because it constituted

> a.      making a claim for state educational funds based on a projected enrollment of 366 students — a number that defendants knew or should have known they would not achieve;
>
> b.      making a claim for state educational funds for the 2013–14 school year when defendants knew or should have known that [the Academy] would not survive the year;
>
> c.      making a false claim for state funds to be used for a non-profit educational purpose that were instead used to benefit defendants.

As a result, the State clearly satisfied the requirements of N.C.G.S. § 1A-1, Rule 9(b), by alleging that Mr. Hall stated in a phone call that occurred on 26 April 2013 that there would be 366 students enrolled at the Academy for the 2013–14 school year, that $344,340.44 in excess funds had been allotted to the Academy as a result of this allegedly false representation, and that the State was seeking to recoup this amount from defendants, a group that included the Academy. As a result, we hold that the State satisfied the requirements of N.C.G.S. § 1A-1, Rule 9(b), in pleading its False Claims Act claim against the Academy.

¶ 51      In addition, we reject the Academy's contention that the State failed to plead the making of an "objective falsehood" and that the State was on notice that the enrollment estimate upon which its False Claims Act claim relied might be lacking

in substantive support. Although the Academy vigorously argues that a projected enrollment figure cannot be the sort of objective falsehood necessary to support liability under the False Claims Act and that the State should have known the nature and extent of the Academy's financial situation at the time that the Academy submitted the enrollment estimate upon which the State's False Claims Act relies, we do not find either of these arguments to be persuasive.

¶ 52        As we read the applicable statutory provision, the estimate of a charter school's student enrollment, which determines how much money the charter school is entitled to receive from the State, must be a genuine, good-faith estimate of the number of students that the charter school anticipates serving rather than an arbitrary figure that the charter school is entitled to present to the Department regardless of its accuracy. A contrary interpretation of the relevant statutory language would authorize charter schools to requisition ever-greater amounts of money from the State regardless of their actual need for the amount of money in question. On the basis of similar logic, the Fourth Circuit has held that an estimate that that is devoid of any factual support is actionable under the federal False Claims Act. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 792 (4th Cir. 1999) (cleaned up) (stating that an "estimate carries with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it").

¶ 53          Similarly, while the State certainly knew that the Academy had long-standing financial difficulties and that the Academy's enrollment numbers had been declining, the State's complaint does not establish that the State had full knowledge of the Academy's situation at the time that Mr. Hall submitted an allegedly inflated student enrollment estimate to the Department. In fact, the complaint alleges that the Academy never informed the Department of the two short-term loans that the Academy took out in the late spring and early summer of 2013. Assuming, without in any way deciding, that knowledge of the falsity of the relevant representation might be sufficient to prevent a finding of liability for the making of that statement under the False Claims Act, any such argument would lack sufficient support given the record that is before us in this case.

¶ 54          The potential harm worked by the Academy's interpretation of the relevant statutory provisions is demonstrated by the allegations in the State's complaint, in which the Academy allegedly estimated that it would serve a far greater student population than it had any basis for believing would actually materialize, received more funds than it could actually use for the purpose of educating students in the upcoming academic year, and used the funds to make questionable payments that had the effect of benefitting school officials and their relatives. Had the Academy refrained from making such an unsupported estimate of student enrollment, the funds that it obtained and used to pay expenses associated with operations during

earlier periods of time would have been available for the education of North Carolina students rather than used for purposes that benefitted the Academy and school officials. As a result, for all of these reasons, we hold that the trial court did not err by denying the Academy's motion to dismiss the State's complaint for failure to state a claim under the False Claims Act.

## C. Liability of Mr. Hall

¶ 55 In seeking to persuade us to reverse the Court of Appeals' determination that the record failed to contain sufficient information to establish that he was entitled to invoke the protections of public official immunity, Mr. Hall begins by asserting that he is a public official because his position as "CEO/Principal" of the Academy was "created by delegation from the Constitution and Statutes as a matter of law," including Article IX, Section 2 of the North Carolina Constitution, which establishes a "general uniform system of free public schools," and N.C.G.S. § 115C-218.15, which provides that a "charter school that is approved by the State shall be a public school within the local school administrative unit in which it is located." In addition, Mr. Hall asserts that, as the Academy's "CEO/Principal," he had discretionary authority and exercised "a part of the sovereign power of the State." Finally, Mr. Hall contends that, since he is entitled to public official immunity, he is not a "person" subject to liability under the False Claims Act.

¶ 56        In response, the State contends that, in determining whether a person is entitled to public official immunity, reviewing courts must consider a number of factors, including "(1) whether the position was created by the constitution or statutes, and (2) whether the official exercises a portion of the sovereign power." *See Isenhour v. Hutto*, 350 N.C. 601, 610 (1999). In view of the fact that the duties of the Chief Executive Officer or principal of a charter school are not outlined in any statutory or constitutional provision, the State asserts that Mr. Hall is not a public officer entitled to the protection of public official immunity. Finally, the State asserts that, even if Mr. Hall was otherwise entitled to claim the benefits of the public official immunity doctrine, the knowing making of false statements is not the sort of activity for which an award of immunity would be appropriate.

¶ 57        As the Court of Appeals correctly recognized, "a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto," *Isenhour v. Hutto*, 350 N.C. 601, 609–10 (1999), with such public official immunity having been recognized because "it would be difficult to find those who would accept public office or engage in the administration of public affairs if they were to be held personally liable for acts or omissions involved in the exercise of discretion and sound judgment," *Miller v. Jones*, 224 N.C. 783, 787 (1945). However, public official immunity is not available to public employees, as compared to public officials, *id.* at

787, or relating to the actions of a public official that were "corrupt or malicious" or "outside of or beyond the scope of his duties," *Smith v. Hefner*, 235 N.C. 1, 7 (1952) (citations omitted). Assuming, without in any way deciding, that a "CEO/Principal" is a public official rather than a public employee and that such a person exercises discretionary authority, we agree with the Court of Appeals that, in light of the State's allegation that Mr. Hall knowingly made "false or fraudulent statements in connection with receiving state funds," the State's complaint contained sufficient allegations to preclude dismissal of the False Claims Act claim that it asserted against Mr. Hall. As a result, the Court of Appeals did not err by denying Mr. Hall's motion to dismiss the False Claims Act claim that the State sought to assert against him in his individual capacity.[5]

---

[5] In addition to his assertion that he was entitled to the dismissal of the False Claims Act claim that the State had asserted against him on public official immunity grounds and his contention that, like the Academy, he could not be held liable based upon his estimate of the Academy's likely student enrollment based upon the State's failure to adequately plead its False Claims Act claim with sufficient particularity, which we reject for the reasons stated earlier in this opinion, Mr. Hall argues that the Attorney General lacked the authority to file suit against him on the State's behalf, that the State's claim was barred by the applicable statute of limitations, that the Attorney General's actions violated the separation of powers provision of the North Carolina Constitution, and that the State had failed to adequately allege a waiver of sovereign immunity. However, none of these additional arguments have any merit given that the Attorney General is specifically authorized to bring False Claims Act claims on behalf of the State by N.C.G.S. § 1-608(a), the State's complaint was filed within six years of the making of the allegedly false statements as authorized by N.C.G.S. § 1-615(a), the Attorney General was acting in accordance with specific legislative authorization at the time that he filed suit against Mr. Hall, and the State had no obligation to plead waiver of an immunity to which Mr. Hall was not entitled. As a result, we hold that none of the additional arguments that Mr. Hall has advanced have merit.

### III.    Conclusion

Thus, for the reasons set forth above, we hold that the Court of Appeals erred by concluding that charter schools were entitled to assert a defense of sovereign immunity and were not "persons" for purposes of the False Claims Act. In addition, we hold that the State adequately stated a claim for relief against the Academy and Mr. Hall under the False Claims Act. Finally, we hold that the Court of Appeals correctly held that Mr. Hall was not, at least on the basis of the present record, entitled to obtain the dismissal of the State's complaint on the basis of public official immunity and that Mr. Hall's other challenges to the trial court's order lack merit. As a result, the Court of Appeals' decision is affirmed, in part, and reversed, in part, and this case is remanded to the Court of Appeals for further remand to Superior Court, Wake County, for further proceedings not inconsistent with this opinion.

AFFIRMED, IN PART; REVERSED, IN PART; AND REMANDED.

Justice BERGER did not participate in the consideration or decision of this case.